NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1068-18
                  A-1594-18
                  A-1884-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

BARRY BERRY,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

KENNETH DANIELS,
a/k/a KENDAL BURNETT,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

LEVELL BURNETT,
a/k/a LAVELLE BURNETT,

| APPROVED FOR PUBLICATION |
| :---: |
| **March 7, 2022** |
| **APPELLATE DIVISION** |

Defendant-Appellant.

_____

Argued (A-1884-18) and Submitted (A-1068-18 and A-1594-18) December 1, 2021 – Decided March 7, 2022

Before Judges Whipple, Geiger and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-06-1583.

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant Levell Burnett (Joseph E. Krakora, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Barry Berry (John A. Albright, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Kenneth Daniels (Frank M. Gennaro, Designated Counsel, on the brief).

Caroline C. Galda, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent State of New Jersey (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Caroline C. Galda, of counsel and on the briefs).

Appellant Kenneth Daniels filed a pro se supplemental brief.

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Co-defendants Kenneth Daniels, Levell Burnett, and Barry Berry appeal from their jury trial convictions for drug and firearms offenses. All three were charged and convicted with being leaders of a narcotics trafficking network, N.J.S.A. 2C:35-3, which is commonly referred to as the "kingpin" offense. Because they were tried together and raise several common issues regarding asserted trial errors, we calendared their appeals back-to-back. We now consolidate their appeals for the purpose of issuing a single opinion.

At trial, a key issue was whether defendants were "high-level" members of a drug trafficking conspiracy. The State did not present testimony from any of the persons the prosecutor claimed to be unindicted co-conspirators, that is, individuals who were supervised or managed by defendants. Accordingly, there was no testimony from a cooperating witness concerning the inner workings of the criminal enterprise. Instead, the State relied on wiretapped telephone calls between defendants to establish their roles within the drug trafficking conspiracy.

After carefully reviewing the record in light of the applicable legal principles, we conclude that the State failed to produce sufficient evidence that Berry occupied a high-level position within the network. Accordingly, the trial court erred in denying Berry's motion for a judgment of acquittal on the leader charge. As to Daniels and Burnett, we conclude that—given the

3

unusual circumstances of this kingpin prosecution—the jury instructions provided by the trial court did not adequately define the term "high level." We therefore reverse their leader convictions and remand for a new trial on that charge. With respect to all three defendants, we affirm their convictions for offenses other than the kingpin offense.

I.

We briefly summarize the facts adduced at trial that pertain to the issues raised on appeal. The investigation by the Essex County Prosecutor's Office (ECPO) Narcotics Task Force leading to this prosecution began on March 19, 2015, when Daniels was arrested for stealing a car. He was incarcerated in the Essex County Jail during the six weeks following his arrest. During that period, the ECPO obtained a wiretap order for a series of recorded telephone calls involving Berry and Burnett. The jailhouse calls contained discussions relating to firearms and narcotics distribution. The ECPO also obtained communication data warrants for information from the Facebook accounts of the three co-defendants. That information included a post of a photograph of Daniels and Burnett together. A posted "selfie" of Daniels appeared to have been taken inside a residence on South 8th Street in Newark.

On April 28, 2015, ECPO Narcotics Task Force Detective Mark Dempsey was conducting a surveillance of the South 8th Street residence

because he had been informed that a person of interest in the ongoing investigation was expected to be at that location. Dempsey saw Burnett leave the residence and apprehended him. Detectives then executed a search warrant at that address, seizing nine glassine envelopes of heroin, a handgun that was found under a mattress, and drug paraphernalia. The officers also found documents that bore Daniels' name. Police also seized handwritten correspondence from Daniels to Burnett.

On October 21, 2015, Orange Police Department Detective Craig Barnett observed a white SUV idling in an area known to police as a "hot spot" for drug sales and gun violence. The detective recognized Berry, who was sitting in the driver's seat of the SUV. The detective and his partner parked their car in a nearby vacant lot and watched Berry using binoculars.

Berry and the passenger were sitting in the SUV talking with the windows down and the passenger-side door open. After a while, two individuals approached the vehicle. The detectives observed one of the individuals give cash to the passenger in exchange for an item the passenger removed from the center console. The individuals then walked away. Shortly thereafter, the detectives observed a second apparent transaction when a woman approached the SUV and handed the passenger cash in exchange for an

A-1068-18

object that was removed from the console. Detective Barnett noticed that Berry appeared to be operating as a "lookout."

The detectives next observed a woman come out of a nearby liquor store and approach the SUV. The passenger moved into the backseat and Berry moved into the passenger seat. The woman who had exited the liquor store got into the driver's seat and began to drive off. The detectives initiated a motor vehicle stop. An ensuing search found a bag in the console that contained eighty-one glassine envelopes of heroin. Berry was charged with possession of heroin with intent to distribute and other related offenses. A subsequent search of his person at the police station revealed $295 in small denominations.

On December 23, 2015, police executed an arrest warrant for Berry at a residential building on Sanford Avenue in Newark, New Jersey. Berry was arrested in the basement apartment. Narcotics fell out of his pants as they were arresting him. Police then obtained and executed a search warrant for the apartment. The search revealed a handgun with fourteen rounds of ammunition, a twelve-gauge shotgun with seven shells, and 550 glassine envelopes of heroin. Police officers also found $804 in cash and three forms of identification that bore Berry's name, listing his address at the Sanford Avenue residence.

A-1068-18

The State at trial played twenty-four intercepted jailhouse telephone conversations. Seventeen of the calls were placed by Daniels to Berry or Burnett. Two of those calls were placed by Daniels to other people. Two of the intercepted calls were placed by Burnett to Daniels. Five calls were placed by Berry.

The State used unique prisoner identification numbers assigned to each defendant that each caller must use when they place a call. To identify the person who was contacted from the jail, the State produced Facebook records that had phone numbers associated with defendants' accounts.

The State argued that the calls show drug distribution activity and introduced expert testimony as to the meaning of several slang words and phrases used in the illicit drug trade. The State's expert, Detective Leon Holloway, opined that references in the calls to "dubs," "nicks," "dimes," and "jugs" referred to quantities of narcotics. Holloway testified that numbers mentioned in the calls related to the price of heroin. He also testified that discussions concerning "grinding," "hustling," and "working" referred to selling narcotics. Daniels stated in one of the calls that he had "sticks under [his] bed." Holloway opined that was slang for a weapon.

The calls also referred to product that needed to be "cheffed up" before people could "reflip" it and "sell [] shot" and for how much. In an effort to

7                                                                          A-1068-18

raise money faster, Daniels instructed his associates to sell the narcotics in double portions by "mak[ing] [it] all dubs and get rid of them shits . . . ." Daniels referred to a person known as "Mod" who was late in making payments that he owed. They discussed threatening him into compliance and using physical force if necessary.

Daniels testified at trial in his own defense and claimed the calls he made while he was in jail show that he was attempting to raise money for bail by collecting debts with help from Burnett. The State argued that those debts were associated with drug distribution. The State also argued that Daniels sought to raise additional funds by continued drug distribution.

In addition to the jailhouse calls, the State presented evidence found at the South 8th Street address in Newark. The investigators found a gun in a bedroom of the house, which was the same room where Daniels' identification was found. Nine envelopes of heroin were found in another bedroom.

On June 9, 2017, an Essex County grand jury indicted Berry, Burnett, and Daniels on seven counts: first-degree leader of a narcotics trafficking network, N.J.S.A. 2C:35-3 (Count One); third-degree conspiracy to distribute controlled dangerous substances (CDS), N.J.S.A. 2C:5-2 and N.J.S.A. 2C:35-5 (Count Two); third-degree possession of heroin, N.J.S.A. 2C:35-10(a) (Count Three); third-degree possession of heroin with intent to distribute, N.J.S.A.

2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3) (Count Four); third-degree possession of heroin with intent to distribute within 1,000 feet of school property, N.J.S.A. 2C:35-7(a) (Count Five); second-degree conspiracy to possess firearms, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:39-5 (Count Six); and second-degree possession of a firearm while in the course of a drug distribution offense, N.J.S.A. 2C:39-4.1 (Count Seven).

Defendant Berry was additionally charged under the same indictment with Counts Eight through Sixteen:  third-degree possession of heroin, N.J.S.A. 2C:35-10(a) (Count Eight); third-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3) (Count Nine); third-degree possession of heroin with intent to distribute within 1,000 feet of school property, N.J.S.A. 2C:35-5 and 2C:35-7 (Count Ten); third-degree possession of cocaine, N.J.S.A. 2C:35-10(a) (Count Eleven); third-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3) (Count Twelve); third-degree possession of cocaine with intent to distribute within 1,000 feet of school property, N.J.S.A. 2C:35-5 and 2C: 35-7(a) (Count Thirteen); third-degree possession of heroin, N.J.S.A. 2C:35-10(a) (Count Fourteen); third-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3) (Count Fifteen); and third-degree possession of

heroin with intent to distribute within 1,000 feet of school property, N.J.S.A. 2C:35-5 and 2C:35-7(a) (Count Sixteen).

Defendants Burnett and Daniels were additionally charged with possession of a stolen firearm, N.J.S.A. 2C:20-7(a) (Count Seventeen). Count Seventeen was dismissed before trial.

Defendants were tried over the course of seven days.

Daniels was convicted on all counts with which he was charged. On October 19, 2018, he was sentenced to life imprisonment with a twenty-five-year period of parole ineligibility. The trial court also imposed a consecutive sentence of ten years for possession of a firearm in the course of a drug distribution offense, and a concurrent five-year sentence for possession with intent to distribute CDS while within 1,000 feet of school property.

Daniels raises the following contentions for our consideration:

POINT I:

THE EXPERT TESTIMONY OF SERGEANT HOLLOWAY WAS IMPROPERLY ADMITTED BECAUSE HIS TESTIMONY STRAYED BEYOND THE EXPLANATIONS OF THE METHODS OF DRUG DISTRIBUTION AND SLANG TERMS AND INTERPRETED COMMON TERMS THAT WERE NOT BEYOND THE KEN OF THE JURY.

POINT II:

THE TELEPHONE CALLS RECORDED ON THE JAIL TELEPHONE WERE IMPROPERLY ADMITTED.

POINT III:

DEFENDANT'S FACEBOOK PAGES WERE IMPROPERLY ADMITTED BECAUSE THEY WERE NOT AUTHENTICATED AND DID NOT QUALIFY AS BUSINESS RECORDS FOR PURPOSES OF N.J.R.E. 803(C)(6).

POINT IV:

THE TRIAL COURT'S FAILURE TO PROPERLY INSTRUCT THE JURY AS TO THE ELEMENTS OF LEADER OF A NARCOTICS TRAFFICKING NETWORK AND AS TO THE NEED FOR UNANIMITY REQUIRES REVERSAL OF THE LEADER CONVICTION.

POINT V:

THE SENTENCE OF LIFE IMPRISONMENT PLUS TEN YEARS, WITH [THIRTY] YEARS PAROLE INELIGIBILITY CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.

In addition to his counseled appeals brief, Daniels submitted a pro se supplemental brief in which he contends:

POINT I:

DEFENDANT'S FOURTH AND FOURTEENTH AMENDMENTS WERE VIOLATED WHEN THE COURT ISSUED A TRANSFER CUSTODY ORDER BASED ON ESSEX COUNTY PROSECUTORS OFFICE'S EX PARTE WITNESS APPLICATION PURSUANT TO N.J.S.A 2A: 67-12, IN VIOLATION

11

OF THE DUE PROCESS CLAUSE AND DEFENDANTS RIGHTS UNDER N.J. CONST. 1947 ART 1. PAR 1.

A. THE EX PARTE APPLICATION ISSUED BY THE ESSEX COUNTY PROSECUTORS OFFICE PURSUANT TO N.J.S.A. VIOLATED DUE PROCESS LAW AND THE DEFENDANTS RIGHTS UNDER ART 1. PAR 10 N.J. CONST 1947.

POINT II:

THE COURT ERRED WHEN IT RELIED ON A GOOD CAUSE SHOWN ANALYSIS TO AUTHORIZE THE TRANSFER CUSTODY ORDER IN VIOLATION OF DEFENDANTS DUE PROCESS RIGHTS AND ART 1. PAR 7. N.J. CONST. 1947.

Burnett was convicted of five of the seven counts charged: first-degree leader of a narcotics trafficking network, (Count One); third-degree conspiracy to distribute a CDS, (Count Two); third-degree possession of heroin, (Count Three); third-degree possession with intent to distribute heroin, (Count Four); and possession with intent to distribute heroin near a school, (Count Five). Counts Two, Three, and Four merged with Count Five and were dismissed. Counts Six, Seven, and Seventeen were dismissed. He was sentenced on November 9, 2018. He was sentenced to the mandatory term of life imprisonment with twenty-five years of parole ineligibility for Count 1 (the leader charge) to be served concurrently with a term of five years, with three years of parole ineligibility, for Count 5.

12

Burnett raises the following contentions for our consideration:

POINT I:

THE FAILURE TO PROPERLY DEFINE TWO ELEMENTS OF THE LEADER CHARGE AND TO PROVIDE A SPECIFIC UNANIMITY INSTRUCTION ON THAT CHARGE REQUIRE REVERSAL OF DEFENDANT'S CONVICTION.

A. THE FAILURE TO DEFINE A "HIGH-LEVEL" POSITION IN THE DRUG-TRAFFICKING NETWORK REQUIRES REVERSAL OF DEFENDANT'S CONVICTION.

B. THE FAILURE TO PROPERLY DEFINE CONSPIRACY IN THE CONTEXT OF THE LEADER CHARGE REQUIRES REVERSAL OF DEFENDANT'S CONVICTION.

C. THE FAILURE TO TELL THE JURY THAT IT HAD TO UNANIMOUSLY AGREE ON WHO DEFENDANT CONSPIRED WITH AND SUPERVISED NECESSITATES REVERSAL OF HIS CONVICTION. (NOT RAISED BELOW)

D. EACH OF THESE INSTRUCTIONAL ERRORS NECESSITATE REVERSAL OF DEFENDANT'S CONVICTION.

POINT II:

THE JAIL CALLS SHOULD NOT HAVE BEEN ADMITTED BECAUSE THERE IS NO PROOF OF CONSPIRACY INDEPENDENT OF THE CALLS.

POINT III:

THE INTERPRETATION OF THE JAIL CALLS BY "AN EXPERT IN NARCOTICS TRAFFICKING"

13

WAS INAPPROPRIATE UNDER N.J.R.E. 702 AND 403 AND NECESSITATES REVERSAL OF DEFENDANT'S CONVICTION UNDER N.J.S.A. 2C:35-3.

A. BECAUSE HOLLOWAY DID NOT HAVE SUFFICIENT EXPERTISE IN THE INTERPRETATION OF SLANG, HIS TESTIMONY FAILED TO MEET THE FIRST PRONG OF N.J.R.E. 702.

B. BECAUSE HOLLOWAY DID NOT APPLY A SOUND METHODOLOGY TO HIS EXPERTISE, HIS INTERPRETATION WAS NOT RELIABLE AND HIS TESTIMONY FAILED TO MEET THE SECOND PRONG OF N.J.R.E. 702.

C. BECAUSE HOLLOWAY'S TESTIMONY WAS NOT HELPFUL TO THE TRIER OF FACT, HIS TESTIMONY FAILED TO MEET THE THIRD PRONG OF N.J.R.E. 702.

D. BECAUSE MUCH OF HOLLOWAY'S TESTIMONY WAS IRRELEVANT AND PREJUDICIAL, ITS ADMISSION VIOLATED N.J.R.E. 403.

E. THE ERRONEOUS ADMISSION OF HOLLOWAY'S TESTIMONY NECESSITATES REVERSAL OF DEFENDANT'S CONVICTION.

POINT IV:

THE MOTIONS TO SUPPRESS SHOULD HAVE BEEN GRANTED. THE ERRONEOUS ADMISSION OF THE EVIDENCE FOUND IN DEFENDANT'S HOME REQUIRES REVERSAL OF HIS CONVICTIONS.

POINT V:

14

THE CROSS-EXAMINATION OF THE CO-DEFENDANT WAS BEYOND SCOPE OF DIRECT, VIOLATED N.J.R.E. 403, 404(B), 608, AND 611, AND NECESSITATES REVERSAL OF DEFENDANT'S CONVICTION UNDER N.J.R.E. 2C:35-3.

POINT VI:

THE CUMULATIVE EFFECT OF THESE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT VII:

THE SENTENCE IS UNCONSTITUTIONAL.

Berry was convicted on all counts with which he was charged. He was sentenced to life in prison with a twenty-five-year period of parole ineligibility for the leader charge (Count One), a concurrent five-year term with a three-year period of parole ineligibility (Count 5), and a ten-year term of imprisonment, with a five-year period of parole ineligibility, to be served consecutively to Count One (Count Seven). The remaining charges were merged and dismissed.

Berry raises the following contentions for our consideration:

POINT I:

THE LOWER COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL ON THE "KINGPIN" CHARGE BECAUSE THE STATE [PROFFERED]

15

ABSOLUTELY NO EVIDENCE THAT [DEFENDANT] EXERCISED ANY CONTROL OR AUTHORITY OVER HIS ALLEGED CO-CONSPIRATORS, CO-DEFENDANTS DANIELS AND BURNETT, WHICH IS AN ESSENTIAL MATERIAL ELEMENT REQUIRED TO SUSTAIN A CONVICTION.

POINT II:

THE NARCOTICS TRAFFICKING LEADER CHARGE FAILED TO DEFINE MATERIAL ELEMENTS OF THE OFFENSE INCLUDING THE REQUIRED SUPERVISORY STATUS OF EACH DEFENDANT AND HOW THAT STATUS RELATES TO THE CONSPIRACY NECESSITATING REVERSAL. (Not Raised Below)

A. THE CHARGE ERRONEOUSLY ALLOWED THE JURY TO FIND THAT DEFENDANT WAS A "KINGPIN" WITHOUT THE DEFENDANT ACTUALLY OCCUPYING A HIGH-LEVEL POSITION IN THE NETWORK; SUPERVISORY CONTROL OVER THE OTHER TWO CO-CONSPIRATORS IS A MATERIAL ELEMENT OF THE OFFENSE.

B. THE CHARGE ERRONEOUSLY PERMITTED THE JURY TO FIND THAT ALL THREE DEFENDANTS WERE "KINGPINS" WHEN THERE WAS ONLY ONE; I.E. THE CHARGE IMPERMISSIBLY ALLOWED FOR A VERDICT THAT WAS NOT UNANIMOUS. (Not Raised Below)

POINT III:

SERGEANT HOLLOWAY'S GROSSLY IMPROPER NARRATION OF THE JAIL CALLS TO INJECT INTO THE CASE HIS "EXPERT" ULTIMATE-

16

ISSUE-OPINION THAT DEFENDANTS WERE ENGAGED IN DRUG-DISTRIBUTION ACTIVITIES [PRONOUNCED] THE DEFENDANTS' GUILT AND USURPED THE JURY'S EXCLUSIVE FUNCTION AS TRIER OF FACT REQUIRING REVERSAL.

POINT IV:

THE LOWER COURT ERRED IN THE ADMISSION OF THE RECORDED JAIL CALLS UNDER THE N.J.R.E. 803(B) HEARSAY EXCEPTION FOR CO-CONSPIRATOR STATEMENTS BECAUSE THE STATE DID NOT PRESENT ANY INDEPENDENT EVIDENCE OF A CONSPIRACY.

POINT V:

THE LOWER COURT ERRED IN PERMITTING THE STATE TO ELICIT EXTRAORDINARILY PREJUDICIAL OTHER CRIMES/BAD ACTS EVIDENCE FROM CO-DEFENDANT DANIELS ON CROSS-EXAMINATION WHICH DID NOT SATISFY THE CRITERIA FOR ADMISSIBILITY UNDER N.J.R.E. 404(B) AND STATE V. COFIELD, 127 N.J. 328 (1992).

POINT VI:

THE AGGREGATE LIFE SENTENCE WITH THIRTY-YEAR PAROLE DISQUALIFIER IS UNCONSTITUTIONALLY CRUEL AND UNUSUAL, AND DISPARATE IN PROPORTION TO OTHER "KINGPIN" SENTENCES IMPOSED IN ESSEX COUNTY.

II.

We first address Berry's contention that the trial court erred by failing to grant his motion for a judgment of acquittal on the leader charge.[1] We begin by acknowledging the legal principles governing our analysis. In State v. Ellis, 424 N.J. Super. 267 (App. Div. 2012), we summarized the legal standard for appellate review of the denial of a motion for judgment of acquittal:

> At the close of the State's case . . ., the court shall . . . order the entry of a judgment of acquittal . . . if the evidence is insufficient to warrant a conviction. R. 3:18-1. However, a trial court must deny the defendant's motion if "'viewing the State's evidence in its entirety . . . and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt . . . beyond a reasonable doubt." State v. Wilder, 193 N.J. 398, 406, 939 (2008) (quoting State v. Reyes, 50 N.J. 454, 458–59, 236 (1967)). On appeal, we utilize the same standard as the trial court in determining whether a judgment of acquittal was warranted. State v. Felsen, 383 N.J. Super. 154, 159 (App. Div. 2006).

> [424 N.J. Super. at 273.]

We find further guidance in the Supreme Court's recent decision in State v. Lodzinski, 249 N.J. 116 (2021), where the Court considered the closely

---

[1] At the close of the State's case, all three defendants moved pursuant to Rule 3:18-1 for a judgment of acquittal on all counts. Daniels and Burnett do not appeal from the denial of their acquittal motions. See Woodlands Cmty. Ass'n v. Mitchell, 450 N.J. Super. 310, 319 (App. Div. 2017) (quoting Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011)) ("An issue not briefed on appeal is deemed waived.").

analogous standard of review of the denial of a motion for a judgment of acquittal notwithstanding a guilty verdict pursuant to Rule 3:18-2. In a 4-3 decision, the Court in Lodzinski reaffirmed that, "a reviewing court must view the entirety of the direct and circumstantial evidence presented by the State and the defendant and give the State the benefit of all the favorable evidence and all the favorable inferences drawn from that evidence, and then determine whether a reasonable jury could find guilt beyond a reasonable doubt." Id. at 144 (citing State v. Williams, 218 N.J. 576, 594 (2014); Reyes, 50 N.J. at 458–59). The Majority opinion nonetheless cautions,

> In evaluating the sufficiency of the evidence, we recognize that jurors "may draw an inference from a fact whenever it is more probable than not that the inference is true," and that "the veracity of each inference need not be established beyond a reasonable doubt." See State v. Brown, 80 N.J. 587, 592 (1979). However, giving the State the benefit of reasonable inferences does not "shift or lighten the burden of proof, or become a bootstrap to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt." Ibid.; accord State v. Perez, 177 N.J. 540, 549–50 (2003). Speculation, moreover, cannot be disguised as a rational inference. Cf. State v. LaFera, 42 N.J. 97, 119 (1964). An accused "may not be condemned upon surmise, conjecture or suspicion." Ibid.
>
> [Id. at 144–145.]

We add that our review of a motion for a judgment of acquittal is de novo. See State v. Jones, 242 N.J. 156, 168 (2020). We assess the sufficiency

19

in the record anew, and therefore owe no deference to the findings of the trial court.  See Williams, 218 N.J. at 593–94.

We next apply this standard of review to the trial record as it pertains specifically to Berry.  As we have noted, all three defendants moved under Rule 3:18-1 for a judgment of acquittal on all counts.  In denying defendants' motions with respect to the leader count, the trial judge found that the jail calls could allow a reasonable jury to find all three defendants guilty.  We reproduce the relevant portions of the trial court's oral ruling:

> The defendants have moved for a judgment of acquittal pursuant to Rule 3:18-1.  In State [v.] Reyes, 50 N.J. at 454, the Supreme Court stated that the broad test for determination of such an application is whether the evidence at this point is sufficient to warrant a conviction of the charge involved.
>
> More specifically, the Court must determine whether viewing the State's evidence in its entirety, be that direct or circumstantial evidence, and giving the State the benefit of all its favorable testimony, as well as all of the favorable inference[s] which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> So, it's a very low standard at this point as someone mentioned.  It's obviously not the proof beyond a reasonable doubt standard that the jury will have to contend with.
>
> On count one, the charge of leader of a drug trafficking network, certain phone calls have been admitted into evidence and played for the jury.

A-1068-18

> Based on the phone numbers that were dialed, which could be found to belong to the defendants based on their Facebook accounts and based on the unique inmate PIN number used to dial out the calls, as well as the content of those calls, the State has set forth evidence with which a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> During the calls, there are discussions that can be inferred to be regarding a drug trafficking network, such as collecting money from certain individuals; packaging and distribution of drugs; the mention of various individuals who appear to be under the authority of the defendants in the organization; orders being given out; discussion about firearms; supervision of lower-level individuals and so forth.
>
> . . . .
>
> Given the evidence that has been admitted, which includes not only the physical evidence that I alluded to, but also the telephone calls and their content, and giving the State the benefit of all its favorable testimony as well as all favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of these charges beyond a reasonable doubt.
>
> Accordingly, the motion to these defendant[s] for a judgment of acquittal shall be denied.

We highlight the court's finding that "[d]uring the calls, there are discussions that can be inferred to be regarding a drug trafficking network . . . the mention of various individuals who appear to be under the authority of the defendants in the organization; orders being given out." The "mention" of (1) those various individuals "who appear to be under the authority of the

21

defendants in the organization" and (2) of unspecified "orders being given out" is the only evidence the trial court alludes to that relates to whether defendants exercised a leadership role within the network.

Notably, the judge's ruling did not elaborate on the specific roles played by each individual defendant. Rather, the judge issued a single common ruling without distinguishing among the three defendants. That analysis was insufficient, especially with respect to Berry's motion, given that the three defendants clearly operated at different levels of authority within the criminal operation. In any event, as we have noted, we owe no deference to the findings of the trial court in deciding whether Berry's motion for a judgment of acquittal should have been granted. See Williams, 218 N.J. at 593–94.

Under the "kingpin" statute, N.J.S.A. 2C:35-3,

> [a] person is a leader of a narcotics trafficking network if he conspires with two or more other persons in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State . . . any controlled dangerous substance classified in Schedule I or II . . . as a financier, or as an organizer, supervisor or manager of at least one other person.

We discuss the elements of the kingpin offense in greater detail in Section III, where we consider whether the jury instructions were adequate in the unusual circumstances of this multi-leader case. For present purposes, it is sufficient to note that the State must prove beyond a reasonable doubt that

22

Berry was a "high-level" member of the network, that is, "one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations." State v. Alexander, 136 N.J. 563, 575 (1994).

The State argues that a reasonable jury could conclude that all three defendants were leaders of what the State characterizes as a "chain conspiracy." See State v. Roldan, 314 N.J. Super. 173 (App. Div. 1998). We are unpersuaded. The State relies on Roldan for the proposition that, within the chain, there was "successive communication and cooperation" between "participants at different levels in the chain [because they] know that the success of those at each level hinges upon the success of the others and therefore cooperate for their mutual benefit." Id. at 182 (citation omitted). The State's reliance on Roldan is misplaced. In Roldan, the defendant was charged with conspiracy to commit the offenses of distribution of cocaine, possession of cocaine with the intent to distribute, and possession of cocaine. Id. at 177. He was not charged with violation of N.J.S.A. 2C:35-3. The leader offense is unlike conspiracy under N.J.S.A. 2C:5-2. The kingpin offense focuses not just on the existence of a conspiratorial relationship but also the level of a defendant's role within the hierarchy of a drug trafficking organization.

A-1068-18

There is no question that under the statutory framework, more than one person can be a leader within a single drug trafficking network. But not every participant in a drug trafficking conspiracy fits the definition of a high-level member. Presumably, every participant performs a function necessary to the successful operations of the network. A drug trafficking network could not operate profitably, for example, without the services of low-level couriers who transport and deliver illicit drugs. The nation's current supply chain crisis resulting from the Coronavirus (COVID-19) pandemic underscores the vital importance, for example, of truckers and off-loaders. But the persons who perform those essential delivery services could hardly be characterized as high-level members of a corporate organization. The COVID-19 crisis reminds us that essential workers are not necessarily high-ranking ones.

Our review of the record leads us to conclude that, even giving the State the benefit of all reasonable inferences, the evidence was insufficient to establish beyond a reasonable doubt that Berry exercised a high-level role as that term is defined in the governing case law. Indeed, the State's own characterization of the organization belies the notion that Berry was a leader. The State's brief responding to Berry's appeal explains:

> During summation, the State argued that the evidence showed the existence of a narcotics trafficking operation primarily headed by co-defendant Daniels, in which co-defendant Burnett acted as an "enforcer."

24

Burnett was "giving the orders that he [got] from [Daniels] to the people below." The State argued that [Berry] also acted as a supervisor by holding a superior position over associates such as "Mod, Esso, Spaz, and Wheezy," and making sure that they were following Daniels's instructions.

We find it noteworthy that the State's brief provides citations to the prosecutor's summation, but not to testimony, specific excerpts of the recorded telephone conversations, or other trial evidence to support the trial prosecutor's argument in summation that Berry "acted as a supervisor by holding a superior position over associates such as 'Mod, Esso, Spaz, and Wheezy,' and making sure that they were following Daniels's instructions." The prosecutor's summation, of course, is not evidence, see State v. Timmendequas, 161 N.J. 515, 578 (1999), and his brief interpretive arguments regarding Berry's role provide no basis upon which we might sustain the denial of defendant's motion for acquittal.

Our own review of the transcripts of the recorded telephone conversations and other trial evidence leads us to conclude that there is insufficient support for the proposition that Berry exercised substantial authority and control over any of those other persons. Rather, it appears that Berry's role essentially was to forward messages and instructions from Daniels, who was incarcerated and thus had limited capacity to communicate directly with persons outside the jail. We do not doubt that Berry's role of

transmitting instructions from other conspirators played an important function within the drug trafficking operation during the period when Daniels was incarcerated. But that function does not evince a high-level supervisory or managerial role within the meaning of N.J.S.A. 2C:35-3, even when giving the State the benefit of all reasonable inferences.

We add that the trial evidence against Berry, aside from the jailhouse calls, does not support a reasonable inference that he "occupie[d] a high-level position of authority in the scheme of distribution." See State v. Wright, 143 N.J. 580, 583 (1996). The evidence seized from Berry's Sanford Avenue residence, for example, clearly shows his involvement in drug trafficking, but not his supervisory role within the organization. So too, testimony concerning Berry's activities in the SUV on October 21, 2015 suggests that he was directly involved in street-level drug distribution but does not support a reasonable inference that he exercised supervision over the other persons in the vehicle. We decline to speculate on what transpired inside the SUV with respect to the supervision of confederates based on police surveillance using binoculars. See Lodzinski, 249 N.J. at 144–45 ("Speculation, moreover, cannot be disguised as rational inference.").

In sum, were we to infer from the scant evidence of Berry's role that he exercised substantial authority and control over the drug trafficking operation,

see <u>Alexander</u>, 136 N.J. at 575, the practical effect would be to "shift or lighten the burden of proof, or become a bootstrap to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt." <u>Lodzinski</u>, 249 N.J. at 144 (quoting <u>Brown</u>, 80 N.J. at 592). Accordingly, we conclude that the trial court should have granted Berry's motion for a judgment of acquittal on the kingpin charge.

## III.

We turn next to defendants' contention that the trial court failed to adequately instruct the jury on the material elements of the leader offense. The judge read verbatim from the model jury charge. Ordinarily, that would be sufficient. However, in the unusual circumstances of this leader prosecution—where all three defendants were charged as leaders—more was required. Here, the jury instruction required more careful explanation of what constitutes a "high-level" member of the conspiracy. By failing to include important explanatory language from the governing case law, we conclude that the jury instruction was inadequate. This is especially so considering that the jury posed a direct question to the court that shows the jury was confused as to the meaning of the term "high level." We therefore are constrained to reverse

and vacate Burnett's and Daniels' leader convictions and remand for a new trial.[2]

We begin our analysis by acknowledging certain foundational principles regarding jury instructions. "Appropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). Proper jury instructions are "crucial to the jury's deliberations on the guilt of a criminal defendant." State v. Jordan, 147 N.J. 409, 422 (1997). In its jury instructions, a "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287–88 (1981)).

---

[2]  We recognize that the State's theory was that the narcotic trafficking operation was "primarily headed by co-defendant Daniels." However, not every drug distribution conspiracy supports a leader charge. See Ellis, 424 N.J. Super. at 274 (citing Cannel, N.J. Criminal Code Annotated, cmt. 1 on N.J.S.A. 2C:35-3 (2011)) ("[T]he clear legislative intent is that the 'kingpin' provision 'be read narrowly and not applied to every drug sale operation.'"). We add that the jury's question regarding how they were to determine what constitutes a "high-level" role was not limited to any particular defendant. We therefore conclude that because multiple persons were charged with being leaders of the same operation, Daniels no less than Burnett and Berry was entitled to a jury instruction that fully explained what it means to be a high-level member of the network.

A-1068-18

"[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error." State v. Jenkins, 178 N.J. 347, 361 (2004) (citing Jordan, 147 N.J. at 421–22). Appellate courts apply a harmless error analysis when a defendant has objected to a jury charge.[3] Ibid.; see also R. 2:10-2. "Under that standard, there must be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it

_____

[3] On May 29, 2018, the trial court heard oral arguments on Burnett's motion to modify the leader of narcotics trafficking network model jury charge. Burnett argued that (1) the leader statute is unconstitutionally vague on its face and as applied in this case, and (2) alternatively, the trial court should edit the model jury charge to make it more consistent with New Jersey Supreme Court and Appellate Division precedent—Alexander, 136 N.J. at 563; Afanador, 151 N.J. 41 (1997), and Ellis, 424 N.J. Super. at 267. The trial court denied the motion. Burnett renewed the argument to edit the model charge and incorporate language from those cases after the trial court received the note from the jury seeking clarification as to the elements of the leader offense. We are satisfied that Burnett properly raised this issue before the trial court, and therefore we review under the harmless error standard. However, even assuming for the sake of argument that defendants failed to raise the same contentions before the trial court they now raise on appeal, we conclude that the plain error standard is also met. The plain error standard "requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Montalvo, 229 N.J. 300, 321 (2017) (citing State v. Chapland, 187 N.J. 275, 289 (2006)). We conclude the trial court's failure to tailor the model instruction, especially given the question posed by the jury, of itself possessed a clear capacity to bring about an unjust result.

A-1068-18

otherwise might not have reached." Baum, 224 N.J. at 159 (quoting State v. Lazo, 209 N.J. 9, 26 (2012)). Therefore, an appellate court must first "determine whether the trial court erred." Jenkins, 178 N.J. at 361 (quoting State v. Brims, 168 N.J. 297, 306 (2001)). If so, we must proceed to determine "if the mistake 'was clearly capable of producing an unjust result such that a reasonable doubt is raised as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid.

"The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." Baum, 224 N.J. at 159 (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)). Model jury charges are often helpful to trial judges in performing the important function of charging a jury. State v. Concepcion, 111 N.J. 373, 379 (1988). A jury charge is presumed to be proper when it tracks the model jury charge verbatim because the process to adopt model jury charges is "comprehensive and thorough." State v. R.B., 183 N.J. 308, 325 (2005). Although following a model jury charge is an important consideration in appellate review, it is not dispositive of whether the charge was adequate. Cf. State v. Whitaker, 402 N.J. Super. 495, 513–14 (App. Div. 2008) (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000)) (explaining that "[w]hen a jury instruction follows the model jury charge, although not

determinative, 'it is a persuasive argument in favor of the charge as delivered'").

As the Supreme Court in <u>Conception</u> stressed, while model jury charges are often useful, "[a]n instruction that is appropriate in one case may not be sufficient for another case. Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." 111 N.J. at 379. "That requirement [to mold the instruction] has been imposed in various contexts in which the statement of relevant law, when divorced from the facts, was potentially confusing or misleading to the jury." <u>State v. Robinson</u>, 165 N.J. 32, 42 (2000). In such instances, "the trial court was required to explain an abstract issue of law in view of the facts of the case." <u>Id.</u> at 43.

"[N]ot every failure [to tailor jury instructions] is fatal." <u>State v. Tierney</u>, 356 N.J. Super. 468, 482 (App. Div. 2003) (quoting <u>State v. Bilek</u>, 308 N.J. Super. 1, 10 (App. Div. 1998)). When the facts are neither complex nor confusing, a court does not have to provide an intricate discussion of the facts in the jury charge. <u>Ibid.</u> (citing <u>State v. Morton</u>, 155 N.J. 383, 422 (1998)); <u>see also</u> <u>State v. White</u>, 326 N.J. Super. 304, 315 (App. Div. 1999) (holding that although a more precise molding of the jury instructions to the

facts would have been preferable, the charge was sufficient because "as a whole, [it] was consistent with the factual theories advanced by the parties").

We next consider the material elements of the leader offense that needed to be explained to the jury. The kingpin crime was enacted as part of the Comprehensive Drug Reform Act of 1986 (CDRA), N.J.S.A. 2C:35-1 to -24. As explained in the CDRA's declaration of policy and legislative findings, the purpose of the leader offense is to target and severely punish "upper echelon members of organized narcotics trafficking networks . . . ." N.J.S.A. 2C:35-1.1(c). This first-degree crime prescribes a sentence of life imprisonment. In Ellis, we held that given the gravity of the penalty, "the clear legislative intent is that the 'kingpin' provision 'be read narrowly and not applied to every drug sale operation.'" 424 N.J. Super. at 274 (citing Cannel, N.J. Criminal Code Annotated, cmt. 1 on N.J.S.A. 2C:35-3 (2011)).

In State v. Feliciano, 224 N.J. 351, 381–82 (2016), the Supreme Court summarized the four separate elements of the leader offense:

> (1) that defendant conspired with two or more persons; (2) that the purpose of the conspiracy included a scheme or course of conduct to unlawfully manufacture, distribute, dispense . . . or transport . . . [heroin]; (3) that defendant was a financier or that defendant was an organizer, supervisor or manager of at least one other person; and (4) that defendant occupied a high-level position in the conspiracy.
>
> [Id. at 381 (emphasis added).]

A-1068-18

In Alexander, the Court made clear that "the status or the position of the defendant . . . is a material element of the crime." Alexander, 136 N.J. at 570. As we explained in Ellis, the Supreme Court "adopt[ed] a restrictive interpretation of this element . . . ." 424 N.J. Super. at 274. Specifically, the Court in Alexander held that the jury must find that

> the defendant occupies a high-level position, that is, a position of superior authority or control over other persons, in a scheme or organization of drug distribution (or manufacturing or dispensing or transporting) and that in that position the defendant exercised supervisory power or control over others engaged in an organized drug-trafficking network.
>
> [136 N.J. at 570–71.]

The Court also stressed that "the role of a defendant as a leader or drug kingpin turns more on the nature of that person's authority, the magnitude or extent of control, and the number of persons over whom that power is exercised." Id. at 575; see also State v. Afanador, 151 N.J. at 55. A defendant's position or status, then, "must be at a superior or high level in relation to other persons in the drug trafficking network and that the defendant's role must be that of a 'leader' in the drug organization or system . . . ." Id. at 136; see also Wright, 143 N.J. at 583 ("[A] proper instruction should, in addition to reciting the statutory language of N.J.S.A. 2C:35-3, at

A-1068-18

least inform the jury that it must find that the defendant occupies a high-level position of authority in the scheme of distribution . . . .").

Importantly for purposes of the present appeal, we emphasized in Ellis that, "[i]n other words, the position within the organization must be 'significant' and 'important,' wielding substantial authority and control over its operations." 424 N.J. Super. at 275. We reached that conclusion based upon clear and explicit direction in Alexander that "[a] 'high-level' or 'upper-echelon' 'leader' of such an organization is one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations." 136 N.J. at 575 (emphases added).[4]

In this case, the judge delivered the following instruction with respect to defendants' leadership roles within the drug trafficking network:

> The fourth element the State must prove beyond a reasonable doubt is that the defendant held a high-level position in the drug trafficking conspiracy. In other words, the State must prove that the defendant occupied a position of superior authority or control over other persons in a scheme or organization of drug distribution, or manufacturing, or transportation, and

---

[4] We note that after Alexander was decided, the Legislature amended N.J.S.A. 2C:35-3 to clarify that a leader must conspire "with two or more persons" and that, unless he or she is alleged to be a financier, must serve "as an organizer, supervisor or manager of at least one other person." L. 1997, c. 343. That revision does not alter what must be proved to establish that a defendant occupies a significant or important position in the organization and exercises substantial authority and control over at least one other person.

that in that position the defendant exercised [supervisory] power or control over others engaged in the drug trafficking conspiracy. The defendant, however, does not have to be the only, or even the primary financier, organizer, supervisor or manager, and it is no defense that defendant was subject to the supervision or management of another, nor that another person or persons were also leaders of the narcotics trafficking network.

As we have noted, the judge read verbatim from the model jury charge. See Model Jury Charges (Criminal), "Leader of Narcotics Trafficking Network" (N.J.S.A. 2C:35-3) (rev. Oct. 23, 2000). However, the model charge does not include language from Alexander that explains, "[a] 'high-level' or 'upper-echelon' 'leader' of such an organization is one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations." 136 N.J. at 575 (emphases added). In the unusual circumstances of this case, we believe this additional explanatory language was necessary. In this particular application, the adjectives "significant," "important," and "substantial" are not superfluous or redundant. Rather, given the distinctive circumstances of this multi-leader prosecution, the highlighted modifiers are, dare we say, significant, important,

and substantial in explaining whether any or all of these three defendants occupied a high-level position in the drug trafficking network.[5]

This is especially so because the jury expressed confusion on this very point of law. During the course of its deliberations, the jury asked the following question: "[w]ith regards to the leader of narcotics trafficking network; in defining high level element, . . . number [four], the wording seems similar a little to element [three].[6] Clarifying question: is it possible to be a supervisor, element [three], but not high-level for element [four]?"

The trial judge responded to the jury question by explaining: "[Three] and [four] on the surface do they sound similar? Yeah, I would agree with you. They sound similar but they [sic] are [four] separate elements to this

---

[5] We do not go so far as to rule that this additional language from <u>Alexander</u> must be charged to the jury in all leader cases. The error in this case was not just the failure to read a few critical words from <u>Alexander</u> but also the failure to mold the jury instructions to address the varying levels of authority of each individual defendant. We nonetheless recommend that the Model Jury Charge Committee consider the advisability of revising the model instruction for the leader offense to incorporate this language from <u>Alexander</u> or at least to include a footnote or notation explaining that this language in <u>Alexander</u> provides further instruction on what it means to hold a high-level position in the drug trafficking conspiracy.

[6] The third element of the leader charge is "that defendant was an organizer, supervisor or manager of at least one other person." <u>Feliciano</u>, 224 N.J. at 381.

offense and you have to consider each one separately." The judge then re-read

the leader jury instruction that he had previously delivered, verbatim.[7]

---

[7] The trial judge re-instructed the jury on the elements of leader of a narcotics trafficking network and provided explanations as to the first two elements. As to the third and fourth elements, the judge once again read verbatim from the model jury charge:

> The third element the State must prove beyond a reasonable doubt is that the defendant acted as a financier, or as an organizer, supervisor, or manager of at least one other person. A financier is a person who with the intent of deriving profit provides money, or credit, or other thing of value in order to purchase a controlled dangerous substance, or an immediate precursor, or otherwise to finance the operations of a drug trafficking network . . . . [T]he State need not prove any intended profit was actually realized.

The trial court omitted the final sentence of the model charge that "[i]t It is not a defense to this charge that the profit, if any, involved in this scheme was intended to be made in another location." The trial court continued with the instruction:

> [An] organizer is a person who purposely arranges, devises, or plans a drug trafficking conspiracy. A supervisor is one who purposely receives [sic] the operation of a drug trafficking conspiracy. A manager is one who purposely directs the operation of a drug trafficking conspiracy.
>
>  . . . .
>
> The fourth element the State must prove beyond a reasonable doubt is that the defendant held a high-level position in the drug trafficking conspiracy. In other words, the State must prove that the defendant

A-1068-18

"When a jury requests clarification, the trial judge is obligated to clear the confusion."  State v. Conway, 193 N.J. Super. 133, 157 (App. Div. 1984) (citing United States v. McCall, 592 F.2d 1066, 1068 (9th Cir. 1979)).  In State v. Parsons, we noted that, "[j]ury questions present a glimpse into a jury's deliberative process."   270 N.J. Super. 213, 224 (App. Div. 1994).   We explained:

> A question from a jury during its deliberations means that one or more jurors need help and that the matter is of sufficient importance that the jury is unable to continue its deliberations until the judge furnishes that help.  An appropriate judicial response requires the judge to read the question with care to determine precisely what help is needed.
>
> [Id. at 221.]

_____

occupied a position of superior authority or control over other persons in a scheme or organization of drug distribution, or manufacturing, or transportation and that in that position the defendant exercised, supervised power or control over others engaged in the drug trafficking conspiracy.  The defendant, however, does not have to be the only or even the primary financier, organizer, supervisor, or manager, and it is no defense that defendant was subject to the supervision or management of another, nor that another person or persons were also leaders of the narcotics trafficking network.

. . . .

In this instance, we believe the jury question shows that the jury was focusing on whether defendants were high-level members of the network. The trial court's instruction that elements three and four have to be considered separately is certainly correct. However, by agreeing with the jury that the terms "supervisor" and "high level" are similar, the court may have unwittingly suggested that being a supervisor is sufficient to establish that a defendant occupied a high-level position within the organization.

Furthermore, merely re-reading the initial jury instruction did not address what we deem to be the fundamental import of the jury's question, which is whether being a supervisor is sufficient to meet the test of holding a high-level position. The answer to that question is no. The two elements must be considered separately because the fourth element requires more than a jury finding that a defendant is a supervisor. As Alexander makes clear, a leader must exercise "substantial authority and control over its operations." 136 N.J. at 575 (emphases added). Not every supervisor in the chain of command of a drug trafficking network is categorically deemed to be a leader of that organization. We add that the leader offense focuses on the qualitative level of supervision that is exercised and not just the number of persons who are supervised. See supra note 4 (discussing legislative amendments to N.J.S.A.

39

2C:35-3 to clarify that a leader need only supervise or manage a single person).

Importantly for purposes of our decision, the State acknowledges that the gravamen of the defense argument is that the trial court did not provide adequate instruction on what "high level" means. We reproduce verbatim the State's response to that defense contention:

> On appeal, [Burnett][8] alleges that since the jury was not given the definition of a material element—what it means to be "high level"—that the instruction was inadequate. However, this is not true. "High level" was defined for the jury not only once, but twice, and the definition itself was taken verbatim from the Supreme Court's language in Alexander. See Alexander, 136 N.J. at 575 (defining "high-level" as "one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations").

---

[8] Daniels raised the same claim, and the State made an essentially identical argument in its brief responding to Daniels' contention:

> [T]he distinction between [occupying a position of superior authority or control over other persons] and [leader of a narcotics trafficking network] was highlighted for the jury not only [once] but twice. "High level" was defined for the jury using the Supreme Court's language in Alexander. See Alexander, 136 N.J. at 575 (defining a "high-level" member of a drug trafficking network as "one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations.").

We read the State's response as a tacit acknowledgment that the language in Alexander that is quoted in the State's parenthetical needed to be read to the jury. But, contrary to the State's assertion, that language was not read to the jury. We have scoured the jury charge delivered by the judge and conclude that the jury was never told that "high level" means "one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations." Rather, the judge read the model jury charge, which does not contain this amplification of the phrase "high level."

As we have noted, in the specific context of this prosecution, where there was no cooperating witness to explain the inner workings of the network and the roles that each defendant played, we view the phrases "significant or important" and "substantial authority and control over its operations" to be an important part of the definition of "high level." Those words were needed in this case to help explain to the jury how to distinguish supervisors and superiors from true leaders.

We stress that the error that constrains us to reverse the leader convictions is not just the trial court's failure to recite a few adjectives from the case law. Rather, the crux of the error was the failure to tailor the model jury charge in a way that addressed the trial proofs regarding the distinct roles

41

played by each individual defendant. The three defendants may have been tried jointly, but each was entitled to a jury instruction molded to the facts pertaining to his own involvement in the criminal organization. We emphasize that unlike a traditional conspiracy prosecution under N.J.S.A. 2C:5-2, which presents essentially a yes or no question as to whether a defendant is a conspirator, the leader offense focuses on a defendant's role within the conspiracy. As we noted in Section II, a person can be a participant in a "chain" conspiracy, to use the State's characterization, and not be a leader within the meaning of N.J.S.A. 2C:35-3.

This was not a situation where the facts were neither "complex nor confusing" as to obviate the need for molded instructions. See Tierney, 356 N.J. Super. at 482. On the contrary, the very nature of this multi-level leader prosecution highlights the importance of providing a comprehensive definition of the term "high level" that could be applied to each defendant. In this instance, moreover, the trial court's "statement of relevant law, when divorced from the facts, was potentially confusing or misleading to the jury," Robinson, 165 N.J. at 42, as shown by the jury's incisive question to the court. That question underscores the need for a carefully tailored jury charge that incorporates the language in Alexander that the State on appeal mistakenly claims was delivered. We therefore conclude that the jury instruction was

inadequate and that the error "was clearly capable of producing an unjust result such that a reasonable doubt is raised as to whether the error led the jury to a result it otherwise might not have reached." Jenkins, 178 N.J. at 361 (quoting Brims, 168 N.J. at 306). Accordingly, we reverse and vacate the leader convictions and remand for a new trial for Burnett and Daniels.[9]

## IV.

Because we reverse and vacate defendants' leader convictions, we need not address several of defendants' contentions regarding other trial errors and the sentences imposed on their leader convictions. We do, however, proceed to address contentions that are relevant to a retrial of Burnett and Daniels on the leader charge, or that relate directly to defendants' convictions for unlawful possession of firearms and possession with intent to distribute CDS. We first address defendants' contentions relating to the admissibility of the intercepted jailhouse telephone calls, starting with the contention that the calls were hearsay evidence and were not admissible under the co-conspirator exception to the hearsay rule, N.J.R.E. 803(b)(5).

---

[9] Burnett additionally contends that the court erred by failing to instruct the jury that "it had to unanimously agree on who defendant conspired with and supervised[.]" So too, Daniels argues that the trial court failed to properly instruct the jury on the need for unanimity. In view of our holding that the failure to adequately define "high level" and to tailor the model jury charge require reversal, we need not address the unanimity argument at length. We are satisfied that the model jury instruction was adequate on that issue.

A.

As a general matter, "in reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015) (quoting Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)).  Under this standard, "'[c]onsiderable latitude is afforded a trial court in determining whether to admit evidence,'" and "an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'"  Id. at 385 (alteration in original) (first quoting State v. Feaster, 156 N.J. 1, 82 (1998); and then quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

The hearsay rule generally provides that "'[a] statement, made other than by the witness while testifying, offered to prove the truth of the content of the statement is hearsay evidence and is inadmissible unless it falls within one of the hearsay exceptions.'"  State v. Savage, 172 N.J. 374, 402 (2002) (quoting State v. Phelps, 96 N.J. 500, 508 (1984)).  "The co-conspirator exception to the hearsay rule, embodied in N.J.R.E. 803(b)(5), provides that statements made 'at the time the party and the declarant were participating in a plan to commit a crime' and 'made in furtherance of that plan,' are admissible into evidence against another member of the conspiracy."  Ibid. (quoting N.J.R.E. 803(b)(5)).

Under this exception, "[w]here two or more persons are alleged to have conspired to commit a crime, any statement made by one during the course of and in furtherance of the conspiracy is admissible in evidence against any other member of the conspiracy."  State v. Harris, 298 N.J. Super. 478, 487 (App. Div. 1997) (first citing N.J.R.E. 803(b)(5); and then citing Phelps, 96 N.J. at 508).

In Phelps, the Supreme Court recognized that admitting evidence of a co-conspirator's statement may advance the goal of discerning where the truth lies, considering that a conspiratorial agreement may be "effectuated through unwritten statements passed from one to another."  96 N.J. at 509.  The Court noted, "[i]t has been said, 'silence, furtiveness and secrecy shroud the conduct and speech of co[-]conspirators.'"  Ibid. (citation omitted).  Thus, "[a] [c]o[-]conspirator's hearsay may be essential to establishing the existence of an illicit agreement."  Ibid.  (citation omitted).

A hearsay statement is admissible under the co-conspirator exception if the following conditions are met:  "(1) the statement must have been made in furtherance of the conspiracy; (2) the statement must have been made during the course of the conspiracy; and (3) there must be 'evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it.'"  Savage, 172 N.J. at 402 (quoting Phelps, 96 N.J. at 509–10).

45

A statement is considered to have been made "in furtherance of the conspiracy" if the statement "serves a 'current purpose such as to promote cohesiveness, provide reassurance to a co-conspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goal of the conspiracy.'" State v. James, 346 N.J. Super. 441, 457 (App. Div. 2002) (quoting State v. Taccetta, 301 N.J. Super. 227, 253 (App. Div. 1997)).

As for the third element, "[t]he trial court must make a preliminary determination of whether there is independent proof of the conspiracy." Savage, 172 N.J. at 403 (citing N.J.R.E. 104(b)). "[T]he trial court must determine whether there is independent evidence 'substantial enough to engender a strong belief in the existence of the conspiracy and of [the] defendant's participation.'" Ibid. (quoting Phelps, 96 N.J. at 519). "The requisite independent evidence may take many different forms, 'such as books and records, testimony of witnesses, or other relevant evidence. There may be a combination of different types of proof.'" Ibid. (quoting Phelps, 96 N.J. at 511). "[T]he prosecution has the burden of satisfying the third part of the test by a fair preponderance of the evidence." State v. Farthing, 331 N.J. Super. 58, 84 (App. Div. 2000) (citations omitted).

In Phelps, our Supreme Court put forth a three-prong test to determine whether co-conspirator statements are admissible under the exception to the

hearsay rule.  96 N.J. at 509.  "First, the statement must have been made in furtherance of the conspiracy.  Second, the statement must have been made during the course of the conspiracy.  Lastly, our courts have held that there must be evidence, independent of hearsay, of the existence of the conspiracy and defendant's relationship to it."  Id. at 509–10 (citations omitted).

This independent evidence may be considered if "such declaration is reliable and . . . there is other evidence substantial enough to engender a belief in the conspiracy's existence and the defendant's participation in it."  Id. at 518–19.  In Phelps, the independent evidence that corroborated the defendant's participation in a bookmaking conspiracy was co-conspirators' notebooks, which listed names that corresponded with people recorded in wiretapped phone calls.  Id. at 506.

"Before admitting such statements, however, a trial court must find that they were made in furtherance of and during the course of the conspiracy and that 'a fair preponderance of evidence' independent of the hearsay statements supports the existence of the conspiracy and of defendant's relationship to it."  State v. Clausell, 121 N.J. 298, 337 (1990) (quoting Phelps, 96 N.J. at 509–10).  The State must thus show that "it is more probable than not that defendant participated in an existing conspiracy in order for the hearsay to be admitted."  Phelps, 96 N.J. at 517–18.

A-1068-18

Defendants' contentions on appeal focus principally on the third element of the co-conspirator exception. The trial court convened a Rule 104[10] hearing and issued a written opinion concluding that all three elements of the exception were satisfied. With respect to the third element, the court found that "[t]he defendants each have made incriminating admissions themselves with regard to the conspiracy. Also, physical evidence connected to each defendant was recovered during the investigation of these offenses, such as controlled dangerous substances (CDS), packaging materials for the CDS, and firearms."

After reviewing the record, including the Facebook evidence, seized CDS, and firearms, we find no basis upon which to overturn the trial court's ruling that there was sufficient independent evidence to satisfy the requirements of the co-conspirator exception. See Harris, 298 N.J. Super. at 488 (concluding there was ample evidence of that defendant's participation in the conspiracy "wholly apart from the hearsay declarations").

We further note that the trial judge found that another exception to the hearsay rule applied: N.J.R.E. 803(b)(1). That rule provides that a statement offered against a party-opponent is excluded from the rule against hearsay and may be admitted in evidence if the statement is "the party-opponent's own statement, made either in an individual or in a representative capacity[.]" Ibid.

---

[10] See N.J.R.E. 104(a).

A-1068-18

We affirm the trial court's ruling that the jailhouse telephone recordings were admissible substantially for the reasons set forth in the trial court's written opinion.

B.

We need only briefly address Daniels' contention that the jailhouse telephone calls were tainted by information unlawfully obtained from his cell phone. He argues that police unlawfully obtained his consent to search the cell phone because the request for consent came after his custodial interrogation was terminated when he asserted his right to consult with an attorney. He contends the seizure of the contact information from the cell phone aided the State's ensuing investigation by identifying parties whose conversations were recorded on the jail telephones.

We need not address the legal issue of whether a valid consent to search can be obtained from an arrestee who has invoked the Fifth Amendment right to counsel[11] because Daniels' argument proceeds from a false factual premise.

---

[11] As we explained in <u>State v. Chappee</u>, the privilege against self-incrimination is analytically distinct from the constitutional protection against unreasonable searches and seizures. 211 N.J. Super. 321, 333 (1986). We further noted that "'[t]he absence of <u>Miranda</u> warnings does not vitiate consent to a seizure of personal property, because the <u>Miranda</u> protections are addressed to constitutional rights that are distinct from Fourth Amendment rights." <u>Ibid.</u> (quoting <u>Hubbard v. Jeffes</u>, 653 F.2d 99, 101–02 (3d Cir. 1981)).

A-1068-18

A Law Division judge[12] determined after a suppression motion hearing that in fact, Daniels had <u>not</u> invoked his right to counsel but rather had waived that right after being advised of his <u>Miranda</u>[13] rights.  The trial judge found there was no basis to disturb the findings of the suppression motion judge.  Nor do we.  <u>See</u> <u>State v. Gamble</u>, 218 N.J. 412, 424 (2014) ("Appellate courts reviewing a grant or denial of a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record.").

V.

Defendants raise various contentions regarding expert testimony by Sergeant Leon Holloway, who narrated the jailhouse telephone calls and opined as to the meaning of certain terms and jargon.  The trial judge convened a <u>Rule</u> 104 hearing and decided that Holloway was qualified as an expert and could present testimony regarding terms and slang used in the drug trade that would not be known by the average juror.  The court also permitted Holloway to opine on:  drug organization structures and the different functions that are performed within a drug trafficking organization; the packaging of

---

[12]  Daniels' suppression motion concerning the consent search of his cell phone was heard by the Morris County Criminal Presiding Judge because defendant had pending charges in that county.

[13]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

CDS; the prices of different CDS; drug distribution and debt collection practices; and the role of firearms in drug trafficking networks. The judge precluded Holloway from testifying as to terms that are not beyond the ken of the average juror. The judge also precluded Holloway from offering an opinion as to a defendant's state of mind, e.g., whether a defendant intended to distribute CDS.

Unlike lay opinion testimony, expert testimony is given by an individual who possesses specialized knowledge about a particular subject. N.J.R.E. 702. That specialized expertise is then used to "address matters outside a juror's understanding." State v. Hyman, 451 N.J. Super. 429, 443 (App. Div. 2017). N.J.R.E. 702, which governs expert testimony, states "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

The party offering expert testimony must establish three foundational requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror;
>
> (2) the subject of the testimony must be at a state of the art such that an expert's testimony could be sufficiently reliable; and

A-1068-18

(3) the witness must have sufficient expertise to explain the intended testimony.

[State v. Harvey, 151 N.J. 117, 169 (1997) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)).]

Significantly, the decision by the trial court that a witness is competent to testify as an expert is entitled to deference absent a showing of abuse of discretion. See Carey v. Lovett, 132 N.J. 44, 64 (1993).

## A.

As we have noted, a witness "offered as an expert must . . . be suitably qualified and possessed of sufficient specialized knowledge to be able to express such an opinion and to explain the basis of that opinion." State v. Odom, 116 N.J. 65, 71 (1989). The expert must have specialized knowledge and expertise through education, experience, formal or informal training, or any combination. See State v. Smith, 21 N.J. 326, 334 (1956).

Burnett contends that Holloway was not a qualified expert in narcotics trafficking, asserting: (1) he does not possess a degree in criminology, sociology, or any other related social science; (2) he has not attended a high-intensity drug-trafficking-area course in ten years; and (3) his expertise in the subject area came from his participation in controlled buys and his surveillance of hand-to-hand drug transactions, along with watching YouTube videos, and reading an urban dictionary rather than academic literature.

A-1068-18

These contentions do not warrant extensive discussion.  R. 2:11-3(e)(2).  The record shows that Holloway has almost thirty years of experience in law enforcement, twenty-one of which were spent assigned to narcotics enforcement units.  He has been involved in more than 15,000 narcotics investigations throughout his law enforcement career and has testified as an expert witness in narcotics cases more than 800 times in Superior Court and once in federal court.  In addition, Holloway has authored hundreds of reports in those investigations and cases.

Based on that extensive experience in the field of narcotics, the trial court correctly found that Holloway "is familiar with the jargon of the drug trade given his experience in the field, which continues to this day."  The trial court in no way abused its discretion in finding that Holloway was qualified as an expert witness to interpret coded language and drug slang.

Burnett next argues that Holloway did not apply a sound methodology to his expertise, and thus failed to meet the requirements of N.J.R.E. 702 that "the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable."  Kelly, 97 N.J. at 208.  We reject Burnett's contention that Holloway's expertise is based on "anecdotal, haphazard on-the-job training" and that he failed to employ any "scientific methodology."  N.J.R.E. 702 expressly provides that a witness may be

53

qualified as an expert" by knowledge, skill, experience, training, <u>or</u> education." (emphasis added). <u>See</u> <u>Smith</u>, 21 N.J. at 334 (explaining that "an expert may be qualified by study without practice or practice without study . . . ").

B.

All three defendants contend that the trial court erred in allowing Holloway to opine on the meaning of terms and phrases that defendants used during the recorded telephone conversations. They argue the language they used was not beyond the ken of the jury. We disagree.

The law is well-settled that in narcotics prosecutions, expert testimony can be utilized so long as the subject matter to be discussed by the expert is not within the average juror's common understanding. <u>State v. Cain</u>, 224 N.J. 410, 420 (2016); <u>see</u> <u>also</u> <u>State v. McLean</u>, 205 N.J. 438, 459 (2011). In <u>State v. Doriguzzi</u>, we held that "[a] factfinder should not be allowed to speculate without the assistance of expert testimony in an area where the average person could not be expected to have sufficient knowledge or experience." 334 N.J. Super. 530, 538 (App. Div. 2000). In <u>Hyman</u>, we held that an expert on narcotics trafficking can testify about "drug slang or code words [that] remain beyond the average juror's understanding." 451 N.J. Super. at 446. However, a drug dealer's "facially coherent conversations" do not require expert interpretation. <u>Id.</u> at 446–47. An expert's opinions, moreover, should not

"stray from interpreting drug code words, and pertain to the meaning of conversations in general and the interpretation of 'ambiguous statements that were patently not drug code.'" Ibid. (quoting State v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2003)).

The question of whether such expert testimony is permissible under N.J.R.E. 702 is left to the trial court to resolve in its function as a gatekeeper. Id. at 447 (citing State v. Nesbitt, 185 N.J. 504, 514 (2006)). The trial court must determine whether this opinion testimony will assist the jury in understanding "drug slang or code words . . . beyond the average juror's understanding[.]" Ibid. That discretionary decision is subject to a deferential standard of appellate review. Id. at 441.

Defendants challenge Holloway's testimony concerning the following terms/phrases and interpretations:

> Holloway opined the phrase "shit drying up" means "no activity" and that "[defendants] want to keep the flow of the distribution taking place."
>
> Holloway opined the phrase "[t]ake his money, pin it, flip it. Keep turning over" referred to "the money that's being brought in from the illegal transactions," and that the defendants wanted to "keep it going."
>
> Holloway opined the term "grind" meant "to put in work" and "push the product."

A-1068-18

Holloway opined the term "hustle" meant "[m]aking it happen." He also opined that the word "hustle" could mean "putting in work" or "hardworking."

Holloway opined that the term "sticks" has multiple meanings and could refer to firearms or Xanax pills. He opined that in this case, the term referred to firearms longer than a handgun.

Holloway opined that the phrase "I'mma tighten him up today" could mean either a verbal or physical altercation.

We have reviewed the transcripts of the telephone calls and agree that the conversations that were played for the jury were not "facially coherent conversation[s]." See Hyman, 451 N.J. Super. at 446. We also agree with the trial court that the terms and phrases defendants used were a form of drug slang or coded language beyond the ken of the average juror. The expert testimony was thus helpful in providing appropriate context to allow the jurors to understand the meaning of those conversations. Ibid. We add that the trial judge appropriately instructed the jury that it could disregard any portion of Holloway's testimony it found to be not credible. See Espinal v. Arias, 391 N.J. Super. 128, 138 (App. Div.) ("While the trial judge must determine whether the expert's training and experience are sufficient to permit the expert to state an opinion, it remains the jury's function to determine the worth of that opinion.").

C.

Defendants also contend that Holloway improperly opined on their state of mind and the ultimate issue of their guilt. That contention also lacks merit. In addition to opining on the meaning of drug slang, experts may opine on matters "such as quantity and packaging of drugs, and other indicia of drug distribution not commonly understood by lay persons." State v. Simms, 224 N.J. 393, 408 (2016); see also Hyman, 451 N.J. Super. at 446. An expert witness in a drug case, however, may not render an opinion about the defendant's state of mind. Cain, 224 N.J. at 429. "Whether [a] defendant had the requisite state of mind to commit the offense . . . [is] an ultimate issue of fact to be decided by the jury." Id. at 420.

The State first played the recorded telephone calls without interpretation. The State then replayed the recordings and had Holloway narrate, interrupting recordings to offer opinions on the meaning of certain terms and phrases. Defendants contend that the format of Holloway's testimony was improper under the principles established in Cain and Simms.

Defendants' reliance on these cases is misplaced. In Cain, the prosecutor asked a witness a long hypothetical question that incorporated every fact from the record. Cain, 24 N.J. at 431. The only difference between the hypothetical and the record was that the prosecutor left out the defendant's name and replaced it with the term "individual." Ibid. At the end of the

hypothetical, the prosecutor asked the witness whether, in his opinion, the hypothetical just posed would lead him to believe that the "individual" possessed the narcotics in question for personal use or with the intent to distribute. Ibid. The witness then answered that he believed the "individual" possessed the narcotics with the intent to distribute. Ibid. The Court found that this long-winded hypothetical crossed the permissible bounds of expert testimony by allowing the witness to opine on the defendant's state of mind, which is within the exclusive province of the jury. Id. at 429.

In Simms, the defendant was observed by police handing an unknown object to another individual in exchange for currency. Simms, 224 N.J. at 405. The State again used a long hypothetical question that included the assumed fact that heroin was exchanged in the hand-to-hand transaction for currency. Ibid. While the surrounding circumstances indicated that the object was heroin, this was an issue of fact for the jury to decide. Ibid. As in Cain, the Court found that the question improperly usurped the role of the jury and impermissibly allowed the witness to opine on the defendant's state of mind. Ibid.

While defendants in the present case acknowledge that the State did not use an impermissible hypothetical question, they argue that Holloway reached the same impermissible result—directly opining on defendants' guilt—by

interpreting the language defendants used in the recorded conversations. Specifically, defendants argue that Holloway improperly opined on defendants' guilt when he interpreted Daniels statement that he did not "want that shit to dry up" as meaning "no activity" and that "[t]hey want to keep the flow of the distribution taking place."

Defendants also challenge Holloway's interpretation of the phrase "pin it, flip it, keep turning it over." Holloway opined that this means "the money . . . being brought in from the illegal transactions, keep it going . . . . Let's keep the street, the block, working. Let's keep that . . . smooth, even-going flow. The money that's being brought in, turn that over, buy more product."

We are satisfied that Holloway was merely translating slang so that the jury could understand the conversations; we do not believe Holloway's interpretations constitute an impermissible opinion either as to defendants' state of mind or their ultimate guilt with one exception. We are concerned that Holloway at one point used the term "illegal" to describe the transactions. That was not appropriate. We do not believe, however, that fleeting description rises to the level of reversible error viewed in context with the entirety of the sergeant's testimony and the other evidence of illicit drug distribution activity adduced by the State.

Finally, defendants challenge Holloway's interpretation of the term "sticks" as meaning a weapon longer than a handgun. Defendants argue it was inappropriate for Holloway to interpret this term because defendants were charged with unlawful possession of weapons. We disagree. Importantly, Holloway did not testify that any defendant possessed a firearm. Rather, he merely explained that the term "sticks" has multiple meanings and could refer to a type of firearm.

In sum, we find no abuse of discretion by the trial judge in permitting Holloway's expert testimony.

## VI.

We need only briefly discuss Daniels' contention that the trial court erred in admitting into evidence Facebook records that showed names, phone numbers, and postings associated with defendants' accounts. Photos posted on Daniel's Facebook account were used at trial to show that he had been present at the South 8th Street address. Photos also showed Daniels with Burnett and Berry. The records also were used to confirm defendants' nicknames.

Daniels argues the records were not properly authenticated and thus do not qualify under the business records exception to the hearsay rule, N.J.R.E. 803(c)(6). The trial court convened a Rule 104 hearing at which the State

A-1068-18

explained that it had obtained the records via Facebook's dedicated law enforcement portal, which is designed to respond to requests from police.

The admissibility of business records is governed by N.J.R.E. 803(c)(6). Before a writing offered as a business record may be admitted, the proponent must authenticate the record. State v. Marrocelli, 448 N.J. Super. 349, 364 (App. Div. 2017); see also State v. Brunson, 132 N.J. 377, 393 (1993). The authentication requirements are flexible. State v. Hannah, 448 N.J. Super. 78, 88 (App. Div. 2000). Authentication requires only a prima facie showing of authenticity of the proffered record. See State v. Tormasi, 443 N.J. Super. 146, 156–157 (App. Div. 2015). The record may be authenticated by direct or circumstantial proof. Hannah, 448 N.J. Super. at 90.

The trial judge decided to admit the records even though the State at the Rule 104 hearing was unable to provide a certification from the Facebook custodian of records. However, at trial, the State presented a "a certificate of authenticity of domestic records of regularly conducted activity from Facebook." The certificate was signed by Facebook's custodian of records. We are thus satisfied that by the time the records were actually admitted into evidence, the State had presented sufficient authentication so that the Facebook records were admissible under the business records exception to the hearsay rule.

We turn to Burnett's contention that his motions to suppress evidence found during a warrant search of the South 8th Street residence were improperly denied. Burnett filed two motions to suppress: one claiming the warrant was overbroad because it did not specify which apartment to search in the multi-family building, and another contending that the warrant application failed to establish probable cause to believe that weapons would be found. We affirm substantially for the reasons set forth in the motion court's thorough and cogent thirteen-page written opinion denying those motions. Accordingly, we need not re-address defendant's arguments at length. We add the following comments.

"A search based on a properly obtained warrant is presumed valid." State v. Sullivan, 169 N.J. 204, 211 (2001) (citing State v. Valencia, 93 N.J. 126, 133 (1983)). "When a search is conducted pursuant to a warrant, the defendant has the burden of proving the invalidity of that search, namely, 'that there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable.'" Ibid. (quoting Valencia, 93 N.J. at 133). In considering such a challenge, "[w]e accord substantial deference to the discretionary determination resulting in the issuance of the [search] warrant."

62

Id. at 211–212 (alterations in original) (quoting State v. Marshall, 123 N.J. 1, 72 (1991)).

Furthermore, an appellate court reviewing a motion to suppress will "reverse only when the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" Gamble, 218 N.J. at 425 (quoting State v. Elders, 192 N.J. 224, 244 (2007)). We owe no deference, however, to legal conclusions based on established facts, and we review questions of law de novo. State v. Watts, 223 N.J. 503, 516 (2015).

The affidavit in support of the search warrant stated that the building at the South 8th Street address had been subject to "continuous surveillance" for "approximately the past two weeks," and while multiple "visitors have come and gone from the residence," no other residents appeared to be coming and going other than Burnett. The affidavit further stated that title records showed that the building was owned by Rehab Home Improvement and that it had otherwise been abandoned—there were no utility accounts associated with the address, and no mail service was being provided there. The affidavit further averred that investigators believed Burnett to be the sole "resident[]" of the multi-family property, and that it could be "reasonably described as his home."

The motion court found that "[t]he evidence detailed in [the detective's] affidavit is sufficient to establish that the building was either abandoned, and

no warrant was required, or, at most, . . . [Burnett] was the sole occupant." We agree with the motion court that in these circumstances, "[a]s the building's sole occupant, it was reasonable to infer that [Burnett] had access to the vacant units and could use them to store contraband." Cf. State v. Rodriguez, 198 N.J. Super. 569, 574 (App. Div. 1985) (rejecting the argument that the warrant was "too general," and noting that "[i]t is reasonable to infer that an owner-occupier of a two family house who has one apartment vacant has access to that apartment and may stash contraband upon any portion of the entire premises").

## VIII.

Finally, we address the contentions raised by Burnett and Berry that the trial court erred in allowing the prosecutor to cross-examine Daniels on matters beyond the scope of his direct examination. Daniels exercised his right to testify on his own behalf. He claimed that the recorded telephone conversations referred to efforts to collect debts so as to raise money to post bail and not to drug distribution activity. Daniels also denied unlawfully possessing a firearm found under the bed at the South 8th Street address.

Burnett and Berry contend that the prosecutor on cross-examination improperly asked Daniels who he was speaking to in a phone call, which revealed impeachment evidence that was not the subject of a criminal

64

conviction, and improperly strayed into irrelevant and prejudicial testimony relating to the way Daniels had been apprehended for stealing a car. After carefully reviewing the record, we conclude (1) the trial court did not commit reversible error in controlling the scope of the prosecutor's cross-examination, and (2) the judge delivered adequate limiting instructions to the jury. We emphasize that much of the prejudice Burnett and Berry allude to on appeal is mitigated if not rendered moot by our decision to reverse and vacate their leader convictions.[14]

Because we affirm substantially for the reasons explained by the trial judge in addressing defendants' objections at trial, we need not re-address the circumstances of Daniels' cross-examination at length. We add the following comments. The judge warned Daniels during the waiver colloquy that if he elected to testify in his own defense, the jury would be told the date, degree, and sentence of his prior convictions. The court explained that it would instruct the jury that it would be permitted to consider his prior convictions as they relate to his credibility, but not as evidence of a predisposition toward

---

[14]  In the event that Burnett is again tried jointly with Daniels for the leader offense on remand, we expect that the issues relating to the scope of Daniels' cross-examination will not recur since the trial judge on remand will be aware of these potential issues and will be able to take appropriate precautions. We offer no opinion on whether the events that transpired at trial suggest that on remand, Burnett and Daniels should be tried separately.

A-1068-18

criminality. The trial judge also cautioned Daniels that if he elected to testify and mentioned that he had been shot while being apprehended for stealing a car, he would "open a door" to rebuttal from the State that a Grand Jury found the police shooting to be justified.

At trial, the judge ruled that because Daniels testified on direct examination as to the purpose of his calls—to raise bail money—and his lack of contact with Berry, the State would be permitted to cross-examine Daniels on his credibility as a witness. In his final instructions to the jury, the trial reiterated the limited purposes for which the jury would be permitted to consider the evidence of defendant's prior convictions.[15]

---

[15] Those instructions read in pertinent part:

> Now, you've heard evidence that Kenneth Daniels has previously been convicted of crimes. This evidence may only be used in determining the credibility or believability of the defendant's testimony. You may not conclude that the defendant committed any of the crimes charged in this case or is more likely to have committed any of the crimes charged simply because he committed a crime on another occasion.
>
> A jury has a right to consider whether a person who has previously failed to comply with society's rules, has demonstrated through a criminal conviction would [be] more likely to ignore the oath requiring truthfulness on the witness stand than a person who has never been convicted of any crime. You may consider in determining this issue the nature and

The situation became more complex when the court allowed the prosecutor to pose questions regarding criminal acts not evidenced by a conviction. To put the issue before us in context, we note that Daniels was incarcerated in jail pending disposition of a stolen vehicle charge—a charge that was not before the present jury. During the prosecutor's cross-examination of Daniels regarding the content and purpose of the jail telephone calls, Daniels blurted out that he had been shot by the police. The court immediately instructed the jury to disregard that testimony.[16]

Daniels thereafter mentioned the shooting multiple times, despite repeated warnings from the judge not to do so. Daniels claimed that the present prosecution was part of a police conspiracy to retaliate against him

_____

> degree of the prior convictions and when they occurred.
> Now, our law permits a conviction to be received in evidence only for the purpose of affecting the credibility of the defendant and for no other purpose. You are not, however, obligated to change your opinion as to the credibility of the defendant simply because of prior convictions. You may consider such evidence, along with all the other factors we previously discussed, in determining the credibility of the defendant.

[16] After defendant's repeated comments, the trial judge instructed: "Jurors, I will tell you again to disregard the last comment by Mr. Daniels as to being shot or anything else along those lines. That is not before you in this case. You must disregard it; it cannot play any part in your verdict."

A-1068-18

because "there's a pending lawsuit against the police officer who shot me." In light of Daniels' repeated references to the shooting incident and his contention that he had been shot in the back without justification, the judge determined that Daniels had "opened the door" and on that basis, the judge allowed the prosecutor to ask clarifying questions about the shooting incident on cross-examination.[17] The prosecutor's questions established that Daniels had been driving a stolen vehicle, that he had attempted to elude police, and that he was driving toward a State Trooper who was attempting to stop him when the Trooper fired upon him. The State also elicited on cross-examination that the incident resulted in a wound to Daniels' shoulder for which he was treated at a hospital and discharged in less than three hours.

Burnett and Berry argue that Daniels' testimony elicited on cross-examination constitutes inadmissible other crimes evidence under N.J.R.E. 404(b), which provides that "evidence of other crimes, wrongs or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in accordance with such disposition." The State acknowledges that the trial court did not analyze the evidence under the

---

[17] The trial judge found that this testimony "open[ed] the door to it [cross-examination] in an [effort] to curry sympathy to the jury. There's no other reason he raised it."

standard set forth in <u>State v. Cofield</u>, 127 N.J. 328 (1992).[18] We agree with the State, however, that this is an unusual situation not contemplated in <u>Cofield</u>. We are satisfied that the testimony elicited on cross-examination regarding the shooting incident was not used to show that Daniels had a certain disposition or acted in accordance with any such disposition, much less that Burnett or Berry had any such disposition. Nor was the cross-examination testimony used to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue of dispute." N.J.R.E. 404(b). Accordingly, the traditional analysis of other crimes/wrongs evidence does not apply in these unusual circumstances.

---

[18] <u>Cofield</u> establishes a four-part test for admission of other crimes evidence under N.J.R.E. 404(b):

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the other offense charged;
>
> 3. The evidence of the other crime must be clear and convincing;
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [127 N.J. at 338 (citation omitted).]

A-1068-18

Rather, we agree with the trial court that Daniels "opened the door," thus allowing admission of evidence that otherwise would be inadmissible. See State v. B.M., 397 N.J. Super. 367, 381 (App. Div. 2008) ("The doctrine of opening the door allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence."). We thus conclude that the trial court did not err[19] in permitting the prosecutor on cross-examination to challenge Daniels on his account of the shooting incident and his claim of a police conspiracy to fabricate evidence against him.

To the extent we have not addressed them, any remaining contentions raised by defendants, including Daniels' contention regarding the transfer of jail custody, lack sufficient merit to warrant discussion in this opinion, R. 2:11-3(e)(2), especially in view of our decision to reverse defendants' convictions for leader of narcotics trafficking network and to vacate the life sentences imposed on those convictions.

---

[19] We note that as a general proposition, when a trial court does not subject the proffered evidence to the four-part Cofield test, an appellate court assesses the admissibility of that evidence applying a de novo standard of review. See State v. Rose, 206 N.J. 141, 158 (2011). Even applying de novo review, we believe the scope of Daniels' cross-examination was appropriate in the face of Daniels' claims and does not provide a basis upon which to overturn Burnett's and Berry's convictions for the non-leader offenses.

A-1068-18

Affirmed in part and reversed in part. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1068-18